UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEFFREY LOREN SAYLOR,

       Plaintiff,

v.                                                          Case No. 1:11-cv-157
                                                            Hon. Janet T. Neff

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.

_____/

## REPORT AND RECOMMENDATION

       Plaintiff brings this *pro se* action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) denying his claim for disability insurance benefits (DIB) and Supplemental Security Income (SSI).

       Plaintiff was born on May 2, 1957 (AR 202).[1] He completed the 10th grade and has additional training in welding (AR 212). Plaintiff alleged a disability onset date of January 1, 2005 (AR 202). He had previous employment as a carpenter and an assembler in a factory (AR 208). Plaintiff identified his disabling conditions as: back problems; heart conditions; losing control of bodily functions and depression (AR 207). On September 3, 2009, an Administrative Law Judge (ALJ) reviewed plaintiff's claim *de novo* and entered a decision denying benefits (AR 17-34). This decision, which was later approved by the Appeals Council, has become the final decision of the Commissioner and is now before the Court for review.

---

[1] Citations to the administrative record will be referenced as (AR "page #").

## I.  LEGAL STANDARD

This court's review of the Commissioner's decision is typically focused on determining whether the Commissioner's findings are supported by substantial evidence.  42 U.S.C. §405(g); *McKnight v. Sullivan*, 927 F.2d 241 (6th Cir. 1990).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Cutlip v. Secretary of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).   A determination of substantiality of the evidence must be based upon the record taken as a whole. *Young v. Secretary of Health & Human Servs.*, 925 F.2d 146 (6th Cir. 1990).

The scope of this review is limited to an examination of the record only.  This Court does not review the evidence *de novo*, make credibility determinations or weigh the evidence. *Brainard v. Secretary of Health & Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).  The fact that the record also contains evidence which would have supported a different conclusion does not undermine the Commissioner's decision so long as there is substantial support for that decision in the record.  *Willbanks v. Secretary of Health & Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). Even if the reviewing court would resolve the dispute differently, the Commissioner's decision must stand if it is supported by substantial evidence.  *Young*, 925 F.2d at 147.

A claimant must prove that he suffers from a disability in order to be entitled to benefits.  A disability is established by showing that the claimant cannot engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  *See* 20 C.F.R. §§ 404.1505 and 416.905; *Abbott v. Sullivan*, 905 F.2d

918, 923 (6th Cir. 1990).  In applying the above standard, the Commissioner has developed a five-step analysis:

> The Social Security Act requires the Secretary to follow a "five-step sequential process" for claims of disability.  First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience.  Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled.  For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.

*Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001) (citations omitted).

The claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work through step four.  *Jones v. Commissioner of Social Security*, 336 F.3d 469, 474 (6th Cir. 2003).  However, at step five of the inquiry, "the burden shifts to the Commissioner to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile."  *Id.*  If it is determined that a claimant is or is not disabled at any point in the evaluation process, further review is not necessary.  *Mullis v. Bowen*, 861 F.2d 991, 993 (6th Cir. 1988).

The federal court's standard of review for SSI cases mirrors the standard applied in social security disability cases.  *See Bailey v. Secretary of Health and Human Servs.*, No. 90-3265, 1991 WL 310 at * 3 (6th Cir. Jan. 3, 1991).  "The proper inquiry in an application for SSI benefits

is whether the plaintiff was disabled on or after her application date." *Casey v. Secretary of Health and Human Services*, 987 F.2d 1230, 1233 (6th Cir. 1993).

## II.  ALJ'S DECISION

Plaintiff's claim failed at the fifth step.  At step one, the ALJ found that plaintiff has not engaged in substantial gainful activity since the alleged onset date of January 1, 2005 and met the insured status requirements of the Social Security Act through December 31, 2008 (AR 19).  At step two, the ALJ found that plaintiff suffered from severe impairments as follows: history of cardiomyopathy, status post placement of a pacemaker; degenerative disc disease; hypertension; likely chronic pulmonary disease; cognitive disorder; and major depressive disorder (AR 19-20).  At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or equaled the requirements of the Listing of Impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1, specifically Listings 1.04 (disorders of the spine), 4.02 (chronic heart failure), 12.02 (organic mental diseases), 12.04 (affective disorders) and 12.06 (anxiety-related disorders) (AR 20).

The ALJ decided at the fourth step that plaintiff has the residual functional capacity (RFC) to perform light work exertionally as defined in 20 CFR 404.1567(b) and 416.967(b):

> More specifically, the claimant can lift 20 pounds occasionally and 10 pounds frequently; stand and walk for about six hours with regular breaks; and sit for at least six hours with regular breaks.  The claimant cannot climb ladders, ropes or scaffolds; cannot work at heights or around hazards; and cannot kneel, crouch, or crawl.  The claimant must avoid concentrated exposure to dust, fumes, gases and similar pulmonary irritants.  He can occasionally stoop and climb ramps and stairs.  He still maintains the mental residual functional capacity to performed [sic] unskilled work, which requires little judgment to do simple tasks that can be learned on the job in a short period of time.  He should have minimal contact with the public and only occasional interactions with coworkers and supervisors of a brief and superficial nature.  Lastly, the claimant must be allowed to change positions from sitting to standing at will.

(AR 21-22).  The ALJ further found that plaintiff could not perform any of his past relevant work (AR 32).

At the fifth step, the ALJ determined that plaintiff could perform a significant number of unskilled, light jobs in the national economy (AR 33-34).  Specifically, plaintiff could perform 18,200 jobs in the regional economy (defined as the state of Michigan) such as machine tender (4,200 jobs) and assembler (14,000 jobs) (AR 33).  Accordingly, the ALJ determined that plaintiff has not been under a disability, as defined in the Social Security Act, from January 1, 2005 through the date of the decision (September 3, 2009) (AR 34).

## III. ANALYSIS

Plaintiff was represented by counsel during the administrative action.  However, he is proceeding *pro se* in this appeal, and plaintiff has raised four issues in his *pro se* brief.  First, plaintiff contends that he suffers from a disabling back condition.  Second, plaintiff contends that he suffers from a disabling heart condition with dypsnea.  Third, plaintiff contends that he suffers from disabling depression.  These three issues are addressed in a letter brief from plaintiff's former attorney to the ALJ.  *See* Letter Brief (docket no. 16-1).  In his fourth issue, plaintiff seeks to have this court consider recent medical records regarding the alleged deterioration of his condition since the ALJ denied his applications for DIB and SSI in 2009.

### A. Plaintiff's physical impairments

The ALJ noted that plaintiff underwent a lumbar diskectomy in 1996 for a disc herniation in his lumbar spine at the L4-5 level (AR 24).  The ALJ reviewed plaintiff's treatment with his family physician, James W. Leete, M.D.  Plaintiff's treatment notes from December 2005 (approximately 11 months after plaintiff's alleged disability onset date) indicated that plaintiff was

doing well and his activity was good (AR 24, 369).  In April 2006, plaintiff reported that he was looking for work and considering a possible move to Florida (AR 24, 365).  In May 2006, plaintiff was looking for construction work on a daily basis (AR 24, 364).  In June 2006, plaintiff's treatment notes indicated that he had been sentenced to a term of 40 days in jail, but was otherwise well; his back pain was under control and he was exercising regularly (AR 24, 363).

In September 2006, Dr. Leete completed a report for the State of Michigan Department of Human Services, in which he listed plaintiff's diagnoses of recent cardiac arrest, cardiomyopathy, a pacemaker, and severe spinal pain with past surgeries, and opined that plaintiff's condition was stable (AR 27, 356-57).  Given these conditions, the doctor found that plaintiff was limited in his ability to lift and carry 20 pounds occasionally and that he could stand and/or walk for about 6 hours in an 8-hour workday (AR 27, 357).  In November 2006, plaintiff was diagnosed with depression (AR 24, 359).  Despite these limitations, Dr. Leete noted that plaintiff could perform "low exertion" work and could operate an automobile (AR 24, 359).

At a consultative examination in January 2007, Michael J. Simpson, M.D., observed that plaintiff complained of neck and back pain (AR 26, 459).  However, plaintiff was able to ambulate without the aid of an assistive device and there was no evidence of nerve root impingement (AR 24, 459).

In September 2007, plaintiff's treating cardiologist, Mark S. Smith, M.D., noted that plaintiff was "doing poorly" and limited by chronic back pain, heart disease and chronic obstructive pulmonary disease (COPD) (AR 24, 476).  Dr. Smith opined that plaintiff could not go back to work at that time (AR 476).  In response to plaintiff's condition, Dr. Smith re-programmed the pacemaker to make it less rate-responsive with activity, adjusted plaintiff's medications and scheduled plaintiff

for a stress test in two months to assess his exercise tolerance (AR 476). A treatment note (presumably from Dr. Leete) in 2007 reflected plaintiff's complaints that he had questionable agility, strength and cardiac endurance to perform physical labor and carpentry (AR 25, 535). Plaintiff's treatment notes from 2007 indicate a history of substance abuse, with the doctor's plan to taper down plaintiff's use of methadone (AR 25, 537). Other treatment notes from 2007 indicated that plaintiff was non-compliant with his medication (AR 25, 540).

Treatment notes from May 2009, reflected that plaintiff was to taper off of the methadone (AR 25, 551). Plaintiff complained of low back pain and degenerative joint disease and asked the doctor to complete a form regarding an alleged disability (AR 25, 551). At this time, plaintiff also complained of sciatica and pain radiating into his legs (AR 25, 551). During the same month, Dr. Leete completed a physical RFC questionnaire, in which he listed plaintiff's impairments of cardiac arrythmia, low back pain, disc surgery and sciatica, and stated that plaintiff was taking pain medication and methadone (AR 27, 137). The doctor identified additional limitations: plaintiff could sit, stand and walk less than two hours each in an 8-hour workday; he could only sit in a chair for one hour at a time; and he would need to stand and walk for ten minutes each hour (AR 27, 139). Plaintiff could frequently lift 10 pounds and occasionally lift 20 pounds (AR 139). In addition, plaintiff would need to shift positions at will and take unscheduled breaks during an 8-hour workday (AR 139).

In June 2009, plaintiff underwent an x-ray of his lumbar spine which showed some mild degenerative changes with mild compression deformities within his upper lumbar and lower thoracic spine (AR 24-25, 580). X-rays of plaintiff's neck revealed only mild degenerative changes (AR 25, 579).

The ALJ found that Dr. Leete's extreme limitations were not consistent with the doctor's own treatment notes (AR 28). The ALJ found it notable that plaintiff has been on long-term methadone maintenance for his back and neck, and that he was on it in 2004 when working full-time (AR 30). While plaintiff's prescription for methadone could indicate that he is in a high degree of pain, the ALJ observed that plaintiff had similar treatment when he was working "at a very high level of physical exertion" (AR 30). The ALJ found that plaintiff's claim of disabling neck and back pain was not supported by his past treatment, work history, the failure of consultants to find any significant physical abnormalities, the x-rays which revealed only "mild" or "mild to moderate" degenerative changes, the fact that plaintiff has undergone "little" recent testing, and the fact that plaintiff's physicians did not refer him to a specialist (AR 31). In addition, the ALJ noted that plaintiff's continuous job search through 2006 (more than one year after his alleged disability onset date) suggested that he did not consider himself disabled (AR 30). The ALJ also found plaintiff lacking in credibility, noted that at the administrative hearing plaintiff "flatly denied" using illegal drugs after high school, despite his recorded history of cocaine abuse and emergency room physicians noting track marks on his arm (AR 31, 316).

The ALJ noted plaintiff's testimony that he gets around by riding his bicycle or taking public transportation (having lost his driver's license due to a DUI in 2001) (AR 30). The ALJ also noted plaintiff's adult function report, in which he stated that in a typical day: plaintiff takes his medication and waits for it to work; thinks about what to do for the day; performs small and light handyman work; prepares meals twice a day; and makes money performing small jobs and "handyman" jobs (AR 30). The ALJ's RFC determination, which acknowledged significant restrictions in plaintiff's ability to lift, stand, walk, sit, and maneuver his body in the workplace (e.g.,

stoop, crawl, etc.) is supported by substantial evidence.  While the ALJ found that plaintiff's alleged activities gave some support to his claim that he is disabled under the Regulations, these allegations did not overcome the "generally unremarkable medical findings" and other factors listed above (AR 30).

### 1.      Plaintiff's back condition

Plaintiff contends that he suffers from a disorder of the spine which meets the requirements under Listing 1.04.  Plaintiff points to an MRI and EMG from April and August 1996 which indicated L4-L5 disc herniation with right L5 nerve root compression with pain (AR 413), previous back surgery (L4-5 diskectomy) performed in September 1996 (AR 415), and  medical imaging from January 2005 which shows a small disc protrusion at the C3-C4 level (AR 324-25).

A claimant bears the burden of demonstrating that he meets or equals a listed impairment at the third step of the sequential evaluation.  *Evans v. Secretary of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir.1987).  In order to be considered disabled under the Listing of Impairments, "a claimant must establish that his condition either is permanent, is expected to result in death, or is expected to last at least 12 months, as well as show that his condition meets or equals one of the listed impairments."  *Id.* An impairment satisfies the listing only when it manifests the specific findings described in the medical criteria for that particular impairment. 20 C.F.R. §§ 404.1525(d); 416.925(d). A claimant does not satisfy a particular listing unless all of the requirements of the listing are present. *See Hale v. Secretary of Health & Human Servs.*, 816 F.2d 1078, 1083 (6th Cir.1987); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir.1984). *See, e.g., Thacker v. Social Security Administration*, 93 Fed.Appx. 725, 728 (6th Cir 2004) ("[w]hen a claimant alleges that he meets or equals a listed impairment, he must present specific medical findings that satisfy

the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency").  If a claimant successfully carries this burden, the Commissioner will find the claimant disabled without considering the claimant's age, education and work experience. 20 C.F.R. §§  404.1520(d); 416.920(d).

Listing 1.04 states as follows:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> or
>
> B.  Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
>
> or
>
> C.   Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

The "inability to ambulate effectively" as defined in § 1.00B2b is as follows:

> b. What We Mean by Inability to Ambulate Effectively
>
> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes

very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 CFR Pt. 404, Subpt. P, App. 1.

The ALJ found that plaintiff's impairment failed to meet Listing 1.04 because the record "does not demonstrate compromise of a nerve root (including the cauda equina) or the spinal cord with additional findings of: (A) Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and positive straight-leg raising or; (B) Spinal arachnoiditis or; (C) Lumbar spinal stenosis resulting in pseudoclaudication" (AR 20). As previously discussed, the record reflects that plaintiff had only minor degenerative changes in his spine since his surgery in 1996 and had worked after that date. Based on this record, plaintiff has not established that he met the requirements of Listing 1.04 or had a condition which was the medical equivalent of that listing.

### 2.      Plaintiff's heart condition and dyspnea

Plaintiff also contends that he met or equaled the requirements for chronic heart failure, Listing 4.02, which provides as follows:

4.02 Chronic heart failure while on a regimen of prescribed treatment, with symptoms and signs described in 4.00D2. The required level of severity for this impairment is met when the requirements in both A and B are satisfied.

A. Medically documented presence of one of the following:

1. Systolic failure (see 4.00D1a(i)), with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure); or

2. Diastolic failure (see 4.00D1a(ii)), with left ventricular posterior wall plus septal thickness totaling 2.5 cm or greater on imaging, with an enlarged left atrium greater than or equal to 4.5 cm, with normal or elevated ejection fraction during a period of stability (not during an episode of acute heart failure);

AND

B. Resulting in one of the following:

1. Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual; or

2. Three or more separate episodes of acute congestive heart failure within a consecutive 12–month period (see 4.00A3e), with evidence of fluid retention (see 4.00D2b(ii)) from clinical and imaging assessments at the time of the episodes, requiring acute extended physician intervention such as hospitalization or emergency room treatment for 12 hours or more, separated by periods of stabilization (see 4.00D4c); or

3. Inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less due to:

a. Dyspnea, fatigue, palpitations, or chest discomfort; or

b. Three or more consecutive premature ventricular contractions (ventricular tachycardia), or increasing frequency of ventricular ectopy with at least 6 premature ventricular contractions per minute; or

c. Decrease of 10 mm Hg or more in systolic pressure below the baseline systolic blood pressure or the preceding systolic pressure measured during exercise (see 4.00D4d) due to left ventricular dysfunction, despite an increase in workload; or

d. Signs attributable to inadequate cerebral perfusion, such as ataxic gait or mental confusion.

20 C.F.R. Pt. 404, Subpt. P. App. 1, Listing 4.02.

Plaintiff points out that his ejection fraction was tested a low as 35% (AR 384) and that this was supported by the agency's physician during plaintiff's consultative examination. Plaintiff's assertion is partially correct; the consultative examiner, Dr. Simpson, found that plaintiff's medical records "suggest an ejection fraction of somewhere between 35 and 45%" (AR 459). Plaintiff acknowledges that this ejection fraction did not meet the Listing's requirement of 30 %, but contends that his condition is the medical equivalent of the listing. *See* Letter Brief (docket no. 16-1).

The ALJ found that plaintiff's heart condition did not meet or equal the relevant listing, reasoning as follows:

The claimant's impairment failed to meet the listing for 4.02 (Chronic heart failure), because the record, consistent with the findings below, does not demonstrate either systolic of diastolic failure resulting in one of the section B. criteria of the listing (see 20 CFR Part 404 Subpart P, Appendix 1, § 4.02). At the hearing, the claimant's representative argued the claimant met listing 4.02 based on the claimant having an ejection fraction of 35 percent at a time of an acute episode of ventricular tachycardia prior to the implantation of a pacemaker. However, section A subpart 1 of the listing requires an ejection fraction of 30 percent or less during a period of stability, not during an episode of acute heart failure. I also noted that a few months after the implantation of the claimant's pacemaker his ejection fraction was much higher and within a normal range of 50 or above (see Ex. 10F and 11F).

(AR 20).  With respect to the "B" criteria of Listing 4.02, the ALJ found that plaintiff's dyspnea was not of the required severity:

> The medical evidence of record, as discussed above, indicated the claimant experienced a cardiac arrest secondary to ventricular tachycardia in August of 2006. The claimant underwent implantation of pacemaker and a subsequent stress test in March of 2007 that indicated the claimant had poor exercise tolerance as he exercised only to 7 METS; however his left ventricular function was normal.  The claimant's treatment notes from September 2007 indicated he was going to undergo another stress test to determine if his exercise tolerance improved, yet he did not undergo another one until March 2009.  The test in March of 2009 indicated the claimant is doing reasonably well and he exercised over 8 minutes to 9 or 10 METS. During the test the claimant's ejection fraction was 50 percent.  In addition, nearly every physical examination of the claimant failed to indicate he is experiencing any symptoms of congestive heart failure. As a whole the minimal objective findings regarding the claimant's heart condition failed to indicate he would be limited beyond my assessment of the claimant's residual functional capacity for work-related activities above.

(AR 31).

Plaintiff appears to claim that his dyspnea is so severe as to be medically equivalent to chronic heart failure.[2]  An impairment will be deemed medically equivalent to a listed impairment if the symptoms, signs and laboratory findings as shown in the medical evidence are at least equal in severity and duration to a listed impairment.  *See Land v. Secretary of Health and Human Servs.*, 814 F.2d 241, 245 (6th Cir.1986).

> "[M]edical equivalence" can be found in three ways: (1) the claimant has a listed impairment but does not exhibit the specified severity or findings, yet has "other findings" that are "at least of equal medical significance" to the criteria; (2) the claimant has a non-listed impairment that is "at least of equal medical significance" to a listed impairment; or (3) the claimant has a combination of impairments which do not individually meet a Listed Impairment, but are "at least of equal medical significance" to a listing when viewed in totality.  20 C.F.R. § 416.926; 20 C.F.R. § 404.1526.

---

[2] "Dyspnea" is defined as "difficult or labored breathing." *Dorland's Illustrated Medical Dictionary* (28th Ed.) at p. 518.

*Reynolds v. Commissioner of Social Security*, 424 Fed. Appx. 411, 415 at fn. 2 (6th Cir. 2011).

Generally, the opinion of a medical expert is required before a determination of medical equivalence is made. *Retka v. Commissioner of Social Sec.*, No. 94-2013, 1995 WL 697215 at *2 (6th Cir., Nov 22, 1995); 20 C.F.R. §§ 404.1526(b); 416.926(b). If the evidence fails to demonstrate the required severity as to even one of the criteria, it would be fatal to plaintiff's claim. *See Hale*, 816 F.2d at 1083; *King*, 742 F.2d at 973. "Even in cases where the claimant has had an impairment which came very close to meeting a listing, this court has refused to disturb the Secretary's finding on medical equivalence." *Retka*, 1995 WL 697215 at *2, *citing Dorton v. Heckler*, 789 F.2d 363, 366-67 (6th Cir.1986).

Here, no medical expert has opined that plaintiff's condition is medically equivalent to Listing 4.02. The ALJ discussed the medical record and determined that plaintiff's condition did not meet or equal the requirements of Listing 4.02, and a review of the ALJ's determination with respect to Listing 4.02 shows that it is supported by substantial evidence. Accordingly, plaintiff's claim of medical equivalence should be denied.

### B.   Plaintiff's mental impairment (depression)

Plaintiff also contends that he is disabled due to depression. The ALJ observed that plaintiff received treatment for depression (AR 28-29). The ALJ characterized plaintiff's consultative examination by DDS psychologist Lynn McAndrews, Ph.D. as "generally unremarkable": plaintiff's thoughts were logical and goal directed; while plaintiff was hyperverbal and circumstantial in his responses, he had no difficulty understanding or expressing himself; he was oriented; he could identify large cities and famous people; and he could recall two of three objects after a delay (AR 25, 428-34). Dr. McAndrews diagnosed plaintiff with: a panic disorder without

agoraphobia; a cognitive disorder not otherwise specified; a major depressive disorder, severe at this time; and past alcohol abuse (AR 26, 432). She also assigned plaintiff a Global Assessment of Functioning (GAF) score of 40 (AR 433).[3] This GAF score lies within the 31 to 40 range and indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR)*, (4th ed., text rev., 2000), p. 34.

      The ALJ addressed the evidence of plaintiff's mental impairment as follows:

> Based upon the medical evidence obtained through the reconsideration level, State Disability Determination Service medical consultants who reviewed the record on December 27, 2006, concluded the claimant's mental impairments resulted in a moderate restriction in his activities of daily living, moderate difficulty maintaining social functioning, and moderate difficulty maintaining concentration, persistent, or pace (see Ex. 6F and 7F). They also concluded the record reflected no episodes of decompensation of an extended duration (Id.). The DDS medical consultants noted the claimant experienced depression and anxiety secondary to his physical condition and he has mild cognitive limitations related to concerns about his physical condition (see Ex. 7F). They also noted he may have difficulty with complex detailed tasks, but retains the ability to do simple tasks on a sustained basis within his physical limitations. (Id.). The medical evidence discussed above indicated the claimant was diagnosed with depression, a cognitive disorder, and a panic disorder during the

---

[3] The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning" on a hypothetical continuum of mental health-illness. American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR)*, (4th ed., text rev., 2000), pp. 32, 34. The GAF score is taken from the GAF scale, which rates individuals' "psychological, social, and occupational functioning," and "may be particularly useful in tracking the clinical progress of individuals in global terms." *Id*. at 32. The GAF scale ranges from 100 to 1. *Id*. at 34. At the high end of the scale, a person with a GAF score of 100 to 91 has "no symptoms." *Id.* At the low end of the GAF scale, a person with a GAF score of 10 to 1 indicates "[p]ersistent danger of hurting self or others (e.g., recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death." *Id.*

mental Consultative Examination.  I recognize that this examiner assigned a GAF score of 40, which would indicate some impairment in reality testing or communication, or major impairment in several areas.  The assessed GAF score is not particularly helpful, as it is a vague assessment without correlation to specific, work-related mental tasks.  To the extent a low score could be viewed as an opinion that the claimant has significant mental limitations, this conclusion is not at all consistent with the record overall including the claimant's lack of any treatment history of mental health problems, and Dr. McAncrews's [sic] own mental status findings - which were for the most part unremarkable.

In addition, the claimant's primary treating physician, Dr. Leete diagnosed the claimant with depression and anxiety.  However, the claimant has never received mental health treatment and has never been hospitalized for a psychiatric condition, with the only possibility being his apparent hospitalization for a possible drug withdrawal.  The opinion of the DDS medical consultants was that, due to moderate deficiencies in concentration, persistence or pace, the claimant may have trouble with complex tasks, but could perform simple tasks.  This opinion is consistent with the record.  It is also consistent with my finding that the claimant can perform only unskilled work, which by definition requires little judgment to do simple tasks that can be learned on the job in a short period of time.  Even though the claimant was friendly and cooperative during the consultative examination, he reported feeling panicky around other people.   Thus, due to moderate limitations in social functioning, I conclude he should have minimal contact with the public and only occasional interactions with coworkers and supervisors of a brief and superficial nature.

(AR 28-29).

The ALJ's conclusions with respect to plaintiff's depression are supported by substantial evidence for the reasons explained in the decision.  While Dr. Leete diagnosed plaintiff with depression and anxiety, there is no evidence that plaintiff experienced more than moderate limitations in social functioning.  The ALJ could properly discount the GAF score as "not particularly helpful" in this context because it was vague and not connected to work-related mental tasks.  *See Kornecky v. Commissioner of Social Security*, 167 Fed. Appx. 496, 511(6th Cir. 2006) ("we are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score").  The ALJ addressed plaintiff's moderate limitations by restricting  him to minimal

contact with the public and only occasional interactions with co-workers and supervisors.  Plaintiff's claim that he suffers from disabling depression should be denied.

### D.    Plaintiff's recent medical records

Finally, plaintiff's initial brief referred to medical records which were generated after the ALJ issued his unfavorable decision on September 3, 2009.  *See* Brief (docket no. 16).  These records were submitted to the Appeals Council and consist of the following: a letter from Dr. Smith dated March 25, 2010, expressing his opinion that plaintiff "is disabled from taking any job" due to his cardiac history and "significant dyspnea;"  a CT scan of his lumbar spine dated October 6, 2009, which indicated advanced degenerative disc disease and facet arthritis of L4-5, instances of mild disc bulging, and advanced degenerative changes of the facet joints at L4-5, L5-S1 and to a lesser degree at L3-4; a CT scan of the cervical spine from October 6, 2009, indicating mild changes of the discs with minimal central protrusion C2-3 and C3-4 with no herniation (relatively unchanged from the previous examination),  hypertrophic changes of the fact joints at C2-3, C3-4 and to a mild degree C4-5, and mild degenerative disc disease at C7-T1; and a motor nerve study from November 23, 2009 (AR 583-91).

When a plaintiff submits evidence that has not been presented to the ALJ, the court may consider the evidence only for the limited purpose of deciding whether to issue a sentence-six remand under 42 U.S.C. § 405(g).  *See Sizemore v. Secretary of Health and Human Servs.*, 865 F.2d 709, 711 (6th Cir.1988).  Under sentence-six, "[t]he court . . . may at any time order the additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . ." 42 U.S.C. § 405(g).  In a sentence-six remand,

the court does not rule in any way on the correctness of the administrative decision, neither affirming, modifying, nor reversing the Commissioner's decision. *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991). "Rather, the court remands because new evidence has come to light that was not available to the claimant at the time of the administrative proceeding and that evidence might have changed the outcome of the prior proceeding." *Id.*

### 1.      Dr. Smith's letter

Plaintiff's post-hearing solicitation of an opinion letter from Dr. Smith which seeks to address the ALJ's alleged wrongful decision denying benefits does not meet the good cause requirement of a sentence-six remand. *See Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997) (in denying the plaintiff's request for a sentence-six remand, in which the plaintiff sought to add new evidence in the form of a medical opinion that critiqued the ALJ's decision, the court held that there was not "good cause" for a remand, because allowing this opinion "would amount to automatic permission to supplement the administrative records with new evidence after the ALJ issues a decision in the case, which would seriously undermine the regularity of the administrative process"); *Key v. Heckler*, 754 F.2d 1545, 1551 (9th Cir. 1985) (explaining that the good cause requirement would be meaningless if every time a claimant lost before the agency he was free to seek out a new expert witness who might better support his position).

### 2.      CT Scans

The CT scans present a different category of evidence. Unlike Dr. Smith's letter, which was apparently generated to rebut the ALJ's decision, the CT scans appear to be part of plaintiff's ongoing medical treatment. Good cause exists for plaintiff's failure to present this evidence because the tests were not available until about 1 1/2 months after the ALJ issued the

decision denying benefits.  Courts acknowledge that claimant's have limited control over the scheduling of medical tests. *See generally, Nelson v. Shalala*, 93-35343, 1994 WL 108930 (9th Cir. March 29, 1994) (noting that physicians, not patients, order medical tests); *Stubbs v. Apfel*, No. 97-C-7069, 1998 WL 547107 at * 11 (N.D. Ill. Aug. 20, 1998) (good cause shown to remand for consideration of  MRI results when claimant could not afford the test until after the ALJ issued his opinion).

The court concludes that this new evidence is material.  "In order for the claimant to satisfy this burden as to materiality, he must demonstrate that there was  a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore*, 865 F.2d at 711.   The October 2009 CT scans indicate that plaintiff suffers from more extensive degenerative changes than reflected in the previous radiography.  It is not for this court to evaluate how these changes affect plaintiff's ability to work.  It is possible that these recent tests could lead the Commissioner to conclude that plaintiff has additional restrictions which reduce the job base identified by the ALJ (i.e., 18,200 jobs).   In addition, October 2009 CT scans will provide the Commissioner with an additional tool to evaluate plaintiff's impairments. *See*, *e.g.*,  *Geigle v. Sullivan*, 961 F.2d 1395, 1397 (8th Cir. 1992) (MRI performed six months after an administrative hearing is not merely evidence of a deteriorating condition, but also probative of the patient's condition prior to and at the time of the hearing); *Bilodeau v. Shalala*, 856 F. Supp. 18, 21 (D. Mass. 1994) (ordered sentence-six remand for consideration of an MRI  performed six months after ALJ's decision).  While these tests are not relevant to plaintiff's DIB claim (plaintiff was last insured for DIB on December 31, 2008), the tests

would be relevant to his SSI claim. Accordingly, this matter should be remanded for consideration of October 2009 CT scans.

### 3. Motor Nerve study

Plaintiff underwent motor nerve studies with Dr. Julie Gronek, M.D., on November 23, 2009. It appears that the studies were performed as part of plaintiff's medical treatment within two months of the ALJ's decision. However, plaintiff has provided no guidance as to the significance of these studies. For example, there is no report accompanying the study results. Given the lack of context or interpretation of these studies, the court concludes that they are not material, i.e., there is no "reasonable probability" that the Commissioner would reach a different disposition of plaintiff's disability claim if presented with the new evidence.

### 4. Conclusion regarding remand

Based on the foregoing, the court concludes that plaintiff's request for a sentence-six remand should be granted with respect to the CT scans performed in October 2009.

### IV. Recommendation

For the reasons discussed, I respectfully recommend that the Commissioner's decision be **REVERSED** and **REMANDED** pursuant to sentence six of 42 U.S.C. § 405g for consideration of plaintiff's CT scans performed on October 6, 2009. On remand, the ALJ should evaluate those tests as they relate to plaintiff's application for SSI.


Dated: February 10, 2012                          /s/ Hugh W. Brenneman, Jr.
                                                  HUGH W. BRENNEMAN, JR.
                                                  United States Magistrate Judge



21

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).